**WORLDWIDE EQUIPMENT, INC., Appellant,**

v.

**Fairley MULLINS, Administrator of the Estate of Thomas G. Mullins, Appellee.**

**Mack Trucks, Inc., Appellant,**

v.

**Fairley Mullins, Administrator of the Estate of Thomas G. Mullins; and James Darin Thornsberry, Appellees.**

Nos. 1997–CA–001131–MR, 1997–CA–001178–MR.

Court of Appeals of Kentucky.

April 16, 1999.

Discretionary Review Denied by Supreme Court Feb. 16, 2000.

Lionel A. Hawse, Benjamin Cowgill, Jr., Lexington, Brief for Mack Trucks, Inc.

William A. Watson, Middlesboro, Brief for Worldwide Equipment, Inc.

Peter Perlman, Lexington, Brief for Fairly Mullins, Administrator of the Estate of Thomas G. Mullins.

Stephen M. O'Brien, III, Louis W. Rom, Lexington, Brief for James Darin Thornsberry.

Before: COMBS, KNOPF, and KNOX, Judges.

*OPINION*

KNOX, Judge:

This is a negligence and strict liability case. Mack Trucks, Inc. (Mack), and Worldwide Equipment, Inc. (Worldwide), appeal from the order and judgment of the Knott Circuit Court following a jury trial on the issues of, *inter alia:* (1) manufacture and sale of a product which was in a defective and unreasonably dangerous condition to other motorists; (2) negligence in failure to install a rear underride guard; and, (3) failure to warn subsequent modifiers and users of the need for an underride guard to prevent intrusion from following vehicles.

## FACTUAL BACKGROUND

On January 24, 1993, Tommy Mullins crashed his pickup truck into the rear end of a coal truck on Highway 15 in Knott County, Kentucky. Mullins was killed and his passenger, Darin Thornsberry, was injured as a result of this collision. Just prior to the accident, the coal truck had been traveling a short distance ahead of Mullins, and had slowed down to make a left-hand turn. Mullins approached the truck at a closing speed of approximately thirty (30) miles per hour, colliding with the right-rear corner of the coal dump body as the truck began to turn left. Neither Mullins nor Thornsberry was wearing a seat belt upon impact. Mullins died of massive head injuries. Thornsberry hit the windshield and suffered a disk compression fracture of the spine.

In 1981, Mack manufactured the cab-chassis component of what ultimately was completed as a coal dump truck. A cab-chassis is considered an "incomplete vehicle."[1] In February 1981, the cab-chassis was purchased and delivered to Worldwide. Worldwide obtained, from a customer, a request for a coal dump truck and, in order to fulfill the customer's requirements, delivered the cab-chassis to R & S Truck Body, Inc. (R & S), a final-

---

1. "Incomplete vehicle" is a term of art under the Federal Motor Vehicle Safety Standards.

stage manufacturer. Worldwide's contract with R & S called for R & S to manufacture and install a coal dump body, and related hydraulic systems.

R & S completed the vehicle in August 1981. Due to the addition of the coal dump body, the completed vehicle had an overhang on the rear of the truck. The presence of the overhang triggered application of 49 C.F.R. § 393.86, as adopted by Kentucky in 601 KAR 1:005 § 2(7). These administrative regulations require the installation of a rear underride guard, or ICC bumper, prior to the vehicle being placed into service.[2] No such device was either requested by Worldwide or installed by R & S.

Following completion in August 1981, the coal dump truck was sold by Worldwide to its customer for whom the vehicle had been prepared. The truck was returned to Worldwide in January 1989 when the original purchaser traded it in on another vehicle. The following month, in February 1989, Patricia Cook, owner of M & R Trucking, Inc. (M & R), bought the used coal truck from Worldwide. The vehicle retained the coal dump body manufactured and installed by R & S both at the time Cook purchased it, in 1989, and the day of the accident, January 24, 1993.

No rear underride guard had ever been installed.

## VERDICT

Mullins and Thornsberry[3] brought this action against the coal truck driver, Charles Taylor (Taylor), claiming he caused the accident through failure to activate the truck's left turning signal. Taylor was employed by M & R Trucking, the owner/operator of the coal truck at the time of the accident. Mullins and Thornsberry further claimed their injuries were enhanced due to the absence of the underride guard. Premised upon this allegation, they asserted claims against M & R, R & S, and Mack. In addition, Mullins brought a claim against Worldwide, claiming that his injuries were enhanced due to the absence of the underride guard.[4]

The jury rejected Mullins' and Thornsberry's claim against Taylor, and found that Taylor was not at fault in causing the collision. Rather, the jury assessed sixty percent (60%) fault to Mullins. Since M & R failed to equip the truck with an ICC bumper pursuant to state and federal regulations, the trial court directed a verdict against it based on this violation. The jury found M & R five percent (5%) at fault for Mullins' death and Thornsberry's injuries.

---

2. 49 C.F.R. § 393.86 provides:

> Every motor vehicle, except truck-tractors, pole trailers, and vehicles engaged in drive-away-towaway operations, the date of manufacture of which is subsequent to December 31, 1952, which is so constructed that the body or the chassis assembly if without a body has a clearance at the rear end of more than 30 inches from the ground when empty, shall be provided with bumpers or devices serving similar purposes which shall be so constructed and located that:
> (a) The clearance between the effective bottom of the bumpers or devices and the ground shall not exceed 30 inches with the vehicle empty;
> (b) The maximum distance between the closest points between bumpers, or devices, if more than one is used, shall not exceed 24 inches;
> (c) The maximum transverse distance from the widest part of the motor vehicle at

> the rear to the bumper or device shall not exceed 18 inches;
> (d) The bumpers or devices shall be located not more than 24 inches forward of the extreme rear of the vehicle; and
> (e) The bumpers or devices shall be substantially constructed and firmly attached. Motor vehicles constructed and maintained so that the body, chassis, or other parts of the vehicle afford the rear end protection contemplated shall be deemed to be in compliance with this section.

3. Originally, Fairley Mullins, Administrator of the Estate of Thomas G. Mullins and James Darin Thornsberry asserted separate and independent actions arising from this accident. The matters were consolidated on September 1, 1995.

4. Thornsberry did not pursue a claim against Worldwide.

R & S conceded at trial that it was aware of the regulation requiring an ICC bumper but knowingly did not install same, as prior experience dictated customers did not want one attached. The jury determined: (1) R & S was negligent in the design, manufacture, distribution and sale of the coal truck; (2) the coal truck was defective and unreasonably dangerous; and, (3) R & S had failed to warn of the dangerous condition. The jury apportioned fifteen percent (15%) fault to R & S in causing Mullins' death and twenty-five percent (25%) fault for Thornsberry's injuries.

The jury determined that Worldwide sold the truck as a defective product, unreasonably dangerous as a result of not being properly supplied with the ICC bumper, and further concluded Worldwide breached its duty of ordinary care in the design, manufacture, distribution and sale of the coal dump truck. The jury, additionally, determined Worldwide failed to warn of the dangerous condition and assessed fifteen percent (15%) fault to Worldwide in causing Mullins' death. Worldwide moved the court for judgment notwithstanding the verdict, which was denied.

With respect to Mack, the jury concluded Mack's cab-chassis was neither a defective product nor unreasonably dangerous. It further determined Mack had not breached the duty of ordinary care in the cab-chassis' design, manufacture, distribution and sale. However, the jury did return a verdict against Mack under a duty to warn instruction. On this basis, it held Mack five percent (5%) at fault for the death of Mullins and ten percent (10%) at fault for the injuries sustained by Thornsberry. Moreover, the jury, having found Mack acted toward Mullins and Thornsberry with malice, awarded $50,000 in punitive damages to the Mullins estate and $25,000 in punitive damages to Thornsberry. The trial court denied Mack's motion for judgment notwithstanding the verdict.

## ARGUMENTS

Mack argues: (1) Mack did not violate any duty to warn, as a matter of law; (2) the award of punitive damages was contrary to law and fact; (3) appellees failed to prove their injuries were enhanced by the absence of the underride guard on the coal truck; and (4) the Mullins estate failed to establish Mullins actually experienced pain and suffering prior to the instant of his death.

Worldwide contends the original action of the Estate of Thomas Mullins against it was timed-barred. Worldwide also argues the case should never have been permitted to proceed under the theory of products liability. Worldwide further argues that: (1) the middleman statute, KRS 411.340, immunized Worldwide from any responsibility for the allegedly defective truck; (2) application of KRS 281.600 to entities other than motor carriers would be arbitrary, violative of due process, and would render the statute constitutionally vague; and, (3) there was no evidence at trial to warrant the submission of an instruction for pain and suffering on the part of Mullins.

## STRICT LIABILITY

It is Mack's position that the verdict against it resulted from an erroneous duty to warn instruction. Mack advances the argument that, as a matter of law, it did not and could not have violated an unqualified "duty to warn." Worldwide, on the other hand, contends that, as to it, this matter fails to embody the requisite elements of a products liability action. Worldwide posits the state and federal regulations imposed the duty to equip the coal truck with a rear underride guard, not upon Worldwide but, upon M & R as owner/operator of the coal truck. In that M & R breached that duty, Worldwide maintains, any injury resulting from the absence of the safety device is solely attributable to M & R's negligence. In order to fully address each party's positions, it is both beneficial and instructive to review the law of strict liability in Kentucky.

■ In 1966, our Supreme Court subscribed to the principle of strict liability as stated in section 402A of the Restatement (Second) of Torts. *See Dealers Transp. Co. v. Battery Distrib. Co.*, Ky., 402 S.W.2d 441, 446–47 (1965). The strict liability principle of section 402A describes a product as defective for purposes of the application of strict liability as one "in a defective condition unreasonably dangerous to the user or consumer or to his property." *Restatement (Second) of Torts* § 402A (1965).

> This terminology may perhaps leave something to be desired, since it is clear that the "defect" need not be a matter of errors in manufacture, and that a product is "defective" when it is properly made according to an unreasonably dangerous design, or when it is not accompanied by adequate instructions and warning of the dangers attending its use.
>
> The prevailing interpretation of "defective" is that the product does not meet the reasonable expectations of the ordinary consumer as to its safety. It has been said that this amounts to saying that if the seller knew of the condition he would be negligent in marketing the product.

*Ulrich v. Kasco Abrasives Co.*, Ky., 532 S.W.2d 197, 200 (1976)(quoting *Jones v. Hutchinson Mfg., Inc.*, Ky., 502 S.W.2d 66, 69 (1973)) (emphasis and footnotes omitted).

■ Strict liability does not depend on negligence, although there is a close likeness between the two when considered in the context of the term "unreasonably dangerous." Under such an analysis, both principles employ the concept of "reasonable foreseeability."

> The difference is that negligence depends on what a prudent manufacturer, engaged in a business similar to that of the defendant, by the exercise of ordinary care actually should have discovered and foreseen, whereas strict liability depends on what he would have antici-

pated had he been (but regardless of whether he actually was or should have been) aware of the condition of and potentialities inhering in the product when he put it on the market. Where the one is actual, the other is postulated.

*Ulrich*, 532 S.W.2d at 200.

## STRICT LIABILITY AS APPLIED TO WORLDWIDE

■ In light of the above-described distinction between negligence and strict liability, we conclude that Worldwide's argument that a strict liability claim may not attach to this action is without merit. As *Ulrich* explains, negligence turns on actual knowledge of a defective condition unreasonably dangerous, or a condition which, under the exercise of ordinary care, should have been discovered or foreseen. Conversely, strict liability may be imposed where the eventual defect or resulting harm was merely speculative or hypothetical at best.

■ We can see no reason why the theory of strict liability should be precluded from applying to this case. The very underlying purpose of strict liability is to permit injured parties a method of reaching back to the manufacturer or distributor of commercial products, following some form of failure on the product's part. A plaintiff may recover in several ways, "such as under a theory of defective design, defective manufacture or failure to warn. The plaintiff need only prove one." *Clark v. Hauck Mfg. Co.*, Ky., 910 S.W.2d 247, 251 (1995). It matters not whether Worldwide had any actual knowledge, information, or belief respecting a future owner's/operator's compliance, or lack thereof, with a safety statute. According to the principle of strict liability, a manufacturer or distributor retains a duty where injury occurs.

■ Yet, "as a condition precedent to strict liability becoming operative in a particular case, the product sold must be 'unreasonably dangerous' to the user or con-

sumer or to his property." *Nichols v. Union Underwear Co., Inc.*, Ky., 602 S.W.2d 429, 431 (1980). Again, it is not necessary to show the seller/manufacturer knew or should have known of the defect, merely to prove that the defect existed. *Id.* at 433.

In the case sub judice, a directed verdict was entered against M & R, the owner/operator of the coal truck, for failure to comply with the regulatory requirements of 601 KAR 1:005 § 2(7). Such failure constituted negligence per se, since M & R disregarded the directives of a safety statute.

Similarly, the jury determined Worldwide had breached its duty of ordinary care in distributing the coal truck into the stream of commerce. Additionally, the jury found that Worldwide had sold a defective, unreasonably dangerous product. The jury further concluded that Worldwide had failed to provide adequate warning with regard to the use or misuse of the coal truck. Such findings are consistent with the doctrine of strict liability and permissible by law.

## STRICT LIABILITY AS APPLIED TO MACK

On the other hand, the jury ascertained Mack had neither breached its duty of ordinary care, nor produced a defective or unreasonably dangerous cab-chassis. At this juncture, the jury's inquiry of Mack's liability should have ceased. Absent a defective condition, strict liability may not be imposed. *Nichols*, 602 S.W.2d at 431.

Although not controlling in Kentucky, we find *Field v. Omaha Standard, Inc.*, 582 F.Supp. 323 (E.D.Pa.1983) persuasive and well-reasoned. The facts of *Field* are strikingly similar to those before us. There, plaintiff was driving a pickup truck towing a utility trailer, and was following a flatbed aerial utility transporter. At some point the transporter stopped to make a left turn and plaintiff's pickup crashed into the transporter's rear end. The pickup underrode the transporter causing the transporter's tail end to crash through the plaintiff's windshield.

Plaintiff brought a products liability suit against International Harvester (IH), manufacturer of the transporter's cab-chassis, claiming the cab-chassis was defectively designed and manufactured because it did not have a rear underride guard. Following trial, the jury returned a verdict for IH finding the cab-chassis was not defective.

In affirming the trial court's denial of plaintiff's motion for a judgment notwithstanding the verdict, the reviewing court considered three (3) factors: (1) The truck in question was manufactured in separate stages. The first stage involved IH's delivery of the cab-chassis to an intermediate purchaser, the dealer. Thereafter, various parties, including a body builder specialized in building flat-bodied trucks, participated in converting the cab-chassis to a completed truck. The cab-chassis was nothing more than a component of the finished product; (2) The cab-chassis in question was a multi-purpose unit which could have been utilized as one of hundreds of various body configurations; and, (3) Custom in the cab-chassis industry was for the final-stage manufacturer to install an underride guard, if necessary. Given the multi-purpose nature of the cab-chassis subjecting it to so many alterations, cab-chassis manufacturers could not possibly determine whether an underride guard would even be necessary. *Field*, 582 F.Supp. at 326–27.

In our opinion, the factors considered relevant to the *Field* court are similarly applicable with respect to Mack's role as manufacturer of the cab-chassis. Particularly, it is undisputed that Mack's only involvement with the coal truck was the manufacture and sale of said vehicle's cab-chassis. Mack sold this component part to Worldwide who, subsequently, received an order for a coal dump truck. Consequently, Worldwide contracted with R & S, the final-stage manufacturer, to complete the

vehicle. Toward this end, R & S cut off several feet of the chassis rails to provide for the dump bed.

Furthermore, at trial, Mack's expert witnesses [5] testified that, in 1981, when the cab-chassis at issue was built: (1) other manufacturers of incomplete cab-chassis did not notify body builders or subsequent purchasers regarding the ICC requirement; (2) the design of Mack's cab-chassis conformed to the general industry practices and, particularly, the absence of communication between Mack and the final-stage manufacturer conformed to general practice of the industry; (3) there were not any manufacturers of incomplete vehicles or cab-chassis who mounted any sort of rear underride bumper on an incomplete cab-chassis; (4) no manufacturer of cab-chassis notified the subsequent final-stage manufacturer of the ultimate user of the ICC bumper regulations; (5) there are no federal or state regulations which require a cab-chassis manufacturer to either install an ICC bumper or notify an intermediate or final-stage manufacturer or end user of the ICC requirements; and, (6) the Mack cab-chassis conformed with the generally accepted practices of the industry, and the state of the art at the time of manufacture and sale by Mack.

Additionally, in light of the abundant number of possible vehicles the cab-chassis could ultimately become, we believe, as did the court in *Field,* that to expect, much less require, Mack to monitor a cab-chassis throughout its useful life imposes too great a burden on a manufacturer.[6] Although addressing a situation where the owner of a product failed to maintain same in such a manner as to permit the product's integrity to remain intact, we glean the following precept, as pronounced by our Supreme Court, to be instructive:

> There is a limit beyond which the manufacturer simply cannot as a practical matter be expected to go. He is entitled, we think, to rely on the owner of the machine to assume the responsibility for keeping it in safe working order. The owner's failure to do so (and to warn the operator accordingly) might constitute superseding negligence if it could be found that the [product] was unreasonably dangerous in the first place
>
> . . . .

*Ulrich,* 532 S.W.2d at 201. (Citation omitted).

We believe this principle is underscored by the holding in *Childress v. Gresen Mfg. Co.,* 888 F.2d 45 (6th Cir.1989), wherein the court stated: "[A] component part supplier has no duty, independent of the completed product manufacturer, to analyze the design of the completed product which incorporates its non-defective component part." *Id.* at 49.[7]

Applying the foregoing analysis to the facts of this case, we are of the opinion that a manufacturer similarly situated to Mack, in that the manufacturer merely produced a component part, or unfinished product which by law could not be placed into service, and which comported to acceptable state of the art industry standards and practice at the time of manufac-

---

5. Frank Entwisle, a professional engineer who had served as chairman of the task force of the Society of Automotive Engineers studying underride accidents; and, Thomas Franklin Brown, a corporate representative from Mack.

6. It is worth noting that Mr. Entwisle, Mack's engineering expert, testified:

> When you get into bodies, then you've got various bodies that could be put on that same cab and chassis. [I]t and it's not unusual for a cab and chassis to have a different body on it during its life and maybe even a completely different body. If you go from a van body, I've seen trucks that were once vans that were shortened and cut down and make a wrecker out of it. So there's a lot of things you can do with a cab and chassis. . . .

7. *See also Nowak v. E.I. DuPont De Nemours & Co.,* 827 F.Supp. 1334, 1337 (W.D.Mich. 1993); *Miller v. E.I. DuPont de Nemours & Co.,* 811 F.Supp. 1286, 1292 (E.D.Tenn.1992).

ture, cannot be held liable under the strict liability theory of failure to warn. Where there is no federal or state statute or regulation imposing such a duty,[8] and where the product in question is found to be neither defective nor unreasonably dangerous, delegating to a manufacturer the task of tracking the final, and subsequent, configurations attached to its principal structure is entirely too great, much more impractical. The bottom line remains the simple fact that the cab-chassis component of the coal truck bore neither impact nor consequence in the cause of the accident underlying this litigation.

As such, this Court is constrained to apply the "component parts" doctrine, as elucidated in *Field* and as adopted by the Sixth Circuit, in reaching the conclusion that Mack had no duty to warn end-users of the potential dangers arising from the end-users' failure to comply with their legal duty.[9] In tandem with this opinion, we believe the trial court erred in denying Mack's judgment notwithstanding the verdict. Premised on this holding, it is unnecessary for this Court to reach the remaining issues raised solely by Mack on appeal.

## STATUTE OF LIMITATIONS

■■■ Fairley Mullins was appointed administrator of his son's estate on January 25, 1993, the day following the accident. The original complaint against M & R and Mack was filed September 20, 1993. Mullins did not file an amended complaint naming Worldwide as a party until April 25, 1994. It is Worldwide's contention that the amended complaint is barred by KRS 413.140(1)(a), the statute of limitations governing wrongful death actions. Worldwide mistakenly relies upon *Gray v. State Farm*

*Mut. Auto. Ins. Co.*, Ky.App., 605 S.W.2d 775 (1980), wherein this Court opined that KRS 304.39–230(1) and (6) "applies only to injured persons or those who are entitled to survivor's benefits in determining when they must bring an original action." *Id.* at 776. Worldwide interprets this holding as limiting the two-year statute of limitations to only the injured party or one entitled to reparations benefits. We disagree.

Worldwide misconstrues the holding in *Gray* as "limiting" application of the statute (KRS 304.39–230) to only those entitled to survivor's benefits. Contrary to Worldwide's understanding, this Court intended the holding in *Gray* to direct the statute's limitation period be applicable to a "limited" class of persons. In *Gray*, it was stated:

> The major issue as to the application of the statute of limitations was correctly decided by the trial court. The statute applies only to injured persons or those who are entitled to survivor's benefits in determining when they must bring an original action. The statute of limitations does not mention when the reparation obligor shall bring an action to recover benefits which it has paid.
>
> . . . .
>
> Here the reparation obligor asserted its claim by joining as a party in the suit already commenced by the injured party. This statute is silent as to any time limitations when the reparation obligor must join as a party. This silence triggers the five-year limitation statute, KRS 413.120(2). We must conclude that a reparation obligor can properly join as a party in the tort suit prior to judgment, provided the intervention occurs

8. We are reminded the specific administrative regulation in issue here applies to "motor carriers operating in the Commonwealth of Kentucky[,]" not to the manufacture of such vehicles. 601 KAR 1:005. See notes 11 and 12 for the applicable text of the controlling state and federal regulations.

9. *Accord Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 364 N.E.2d 267, 272 (1977),

wherein the Ohio Supreme Court held that the supplier of component parts (operating buttons), incorporated into a power press, which, following modification and assembly by third parties caused serious injuries to plaintiff, did not have a duty to warn end-users of the dangers posed by the inclusion of said components in the final product.

within five years. It is the person suffering the injury who must commence the action.

*Gray*, 605 S.W.2d at 776. As made obvious from the above quotation, the issue addressed by this Court in *Gray* was whether the reparations obligor was restricted by the two-year statute of limitations. The answer was negative, in that the statute permits only the injured party to institute the action and requires the claim be made within two (2) years of the injury or payment of the last reparation benefits.

■ The Motor Vehicle Reparations Act (MVRA) provides:

An action for tort liability not abolished by KRS 304.39–060 may be commenced not later than two (2) years after the injury, *or the death,* or the last basic or added reparation payment made by any reparation obligor, whichever later occurs.

KRS 304.39–230(6) (emphasis added). We have a duty to accord statutory words their literal meaning, unless a verbatim connotation would lead to a wholly unreasonable or absurd conclusion. *Bailey v. Reeves*, Ky., 662 S.W.2d 832, 834 (1984)(citing *Department of Revenue v. Greyhound Corp.*, Ky., 321 S.W.2d 60 (1959)).

■ Giving the statutory words their literal meaning, the two-year limitations period extends to actions which resulted in a "death." It defies a natural reading of the statute to suppose that survivors of those who die as a result of a motor vehicle accident are precluded from asserting a tort claim on behalf of the estate. "A legislature making no exceptions to the positive terms of a statute is presumed to have intended to make none." *Bailey*, 662 S.W.2d at 834 (citing *Commonwealth v. Boarman*, Ky.App., 610 S.W.2d 922 (1980)). The only limiting language con-

tained in the statute regards a tort action "not abolished by KRS 304.39–060." KRS 304.39–060 eliminates tort liability in limited circumstances which have neither impact nor application to the case at hand.[10]

■ Moreover, the one-year statute of limitations applicable to personal injury or wrongful death, KRS 413.140(1)(a), operates as a *general* statute of limitations.[11] It does not make mention of motor vehicle accidents. Conversely, KRS 304.39–230(6) is a *special* statute of limitation, which is part and parcel of an assimilated and extensive statutory scheme (the MVRA), addressing the rights and liabilities of persons involved in motor vehicle accidents. *Troxell v. Trammell*, Ky., 730 S.W.2d 525, 528 (1987).

Our rules of statutory construction are that a special statute preempts a general statute, that a later statute is given effect over an earlier statute, and that because statutes of limitation are in derogation of a presumptively valid claim, a longer period of limitations should prevail where two statutes are arguably applicable. Thus the statutory language in KRS 304.39–230(6) applies rather than the statutory language in KRS 413.140(1)(a) in the present situation where the cause of action is both a motor vehicle accident and a [wrongful death] claim.

*Id.* at 528.

As such, the cause of action asserted against Worldwide in Mullins' amended complaint is not foreclosed by either KRS 304.39–230 or KRS 304.39–060 of the no-fault statutes. Pursuant to the authority set forth above, the two-year statute of limitations must necessarily apply.

## THE MIDDLEMAN STATUTE— KRS 411.340

■ Worldwide argues immunity from liability because of the provisions con-

10. KRS 304.39–060, essentially, abolishes tort liability for certain elements of damages and in specific types of cases when the damages do not meet or exceed the statutory threshold.

11. *See also* KRS 413.180 and *Conner v. George W. Whitesides Co.*, Ky., 834 S.W.2d 652 (1992).

tained in KRS 411.340, relating to middlemen in products liability cases. Worldwide takes the position that since the vehicle, at the time it was sold to M & R, was unaltered from its original condition from the time it was traded-in by the original purchaser, the statute provides Worldwide with a complete defense. We do not agree with Worldwide's understanding and application of this statute.

KRS 411.340 relieves middlemen (wholesalers, distributors or retailers) of liability where: (1) the manufacturer is "identified and subject to the jurisdiction of the court[;]" (2) the product was sold "in its original manufactured condition ... or in the same condition such product was in when received ..." by the middleman; and, (3) the middleman has neither "breached an express warranty ..." nor "knew or should have known at the time of distribution or sale ... that the product was in a defective condition, unreasonably dangerous to the user or consumer."

There is certainly no dispute as to the first requirement. Obviously, Mack, as manufacturer of the cab-chassis, and R & S, as the final-stage manufacturer, are identified and subject to the court's jurisdiction. However, satisfaction of the statutory requirements stops there.

With respect to the second requirement, the cab-chassis was not sold in its original condition as manufactured by Mack. As reflected by the record, R & S cut off several feet of the chassis rails to accommodate the coal dump bed. Arguably, the finished product was sold directly to the initial purchaser in an unaltered condition from that produced by R & S. Although

this fact will not save the day for Worldwide, we deem it a tenuous argument, at best, in that Worldwide provided the specifications for the finished product assembly. It is reasonable that the basic tenets of agency law would estop the advancement of such a position should it be pursued.

Moreover, Worldwide cannot prevail on the third requirement. The testimony produced at trial clearly indicated that a distributor, such as Worldwide, should have been aware of the underride guard requirement, if not in possession of the regulations compelling same. Since there is no issue of breach of an express warranty before this Court we decline discussion of that specific factor. In that Worldwide cannot satisfy the requirements set forth in KRS 411.340, which authorizes immunity from liability, the trial court correctly denied application of said statute as a defense. *Cf. Funk v. Wagner Mach., Inc.,* Ky.App., 710 S.W.2d 860 (1986).

## DUE PROCESS

■■■ Worldwide propounds that application of 49 C.F.R. § 393.86, as adopted in 601 KAR 1:005,[12] and the enabling statute KRS 281.600, to entities other than motor carriers [13] would be both arbitrary and violative of due process guarantees. It further argues that if made applicable, the regulation would be void for vagueness, hence, unconstitutional. However, we are unable to identify how Worldwide has been aggrieved by any of these statutory or regulatory provisions. The trial court directed a verdict against M & R for violation of the applicable regulation (601 KAR

12. 601 KAR 1:005 describes its necessity, function, and conformity as follows:
 This administrative regulation is necessary to set forth the safety requirements that KRS 281.600 allows the Transportation Cabinet to establish. This administrative regulation sets out safety procedures to be followed by motor carriers operating in the Commonwealth of Kentucky.

13. 49 C.F.R. § 390.5 defines "motor carrier" as:

[A] for-hire motor carrier or a private motor carrier. The term includes a motor carrier's agents, officers and representatives as well as employees responsible for hiring, supervising, training, assigning, or dispatching of drivers and employees concerned with the installation, inspection, and maintenance of motor vehicle equipment and/or accessories. For purposes of subchapter B, this definition includes the terms employer, and exempt motor carrier.

1:005 § 2(7)). No other party to this action was charged or held accountable for a similar infraction. The jury was not presented any instruction on the issue of regulatory violation, rather only those of negligence, strict liability, duty to warn and damages, as discussed *supra*. Under the facts of this case, we do not believe Worldwide has standing to raise such challenges. *See Rose v. Council for Better Educ., Inc.*, Ky., 790 S.W.2d 186, 202 (1989). Thus, we pretermit discussion of this issue raised on appeal.

### PAIN AND SUFFERING

 Worldwide submits the trial court erred in permitting an instruction on Mullins' pain and suffering. Worldwide contends there was no evidence establishing Mullins survived the immediate impact with the coal truck. We agree.

 A damages award for pain and suffering will be sustained where there is substantial evidence establishing that pain and suffering actually occurred. *See Prater v. Coleman*, Ky.App., 955 S.W.2d 193, 194 (1997). There was no medical testimony presented respecting Mullins' physical condition which may have given rise to any potential pain and suffering. Contrarily, there was the testimony of passenger Thornsberry who attested that Mullins rendered neither response nor movement immediately following the accident. It is our opinion there is not a scintilla of evidence indicating Mullins' death was not immediate upon initial impact with the coal truck. Consequently, it is our holding that it was error for the trial court not to have directed a verdict on the issue of pain and suffering.

For the foregoing reasons, we remand this matter to the Knott Circuit Court for further proceedings consistent with this opinion.

ALL CONCUR.