**Todd GRAY, Plaintiff,**

v.

**GENERAL MOTORS CORPORATION and State Farm Mutual Automobile Insurance Company, Defendants.**

Civil Action No. 97–394.

United States District Court,
E.D. Kentucky,
London Division.

Jan. 22, 2001.

John C. Carter, Harlan, KY, Phyllis Robinson, Manchester, KY, for Todd Gray.

Linsey W. West, Christopher Rennie Cashen, Woodward, Hobson & Fulton, L.L.P., Lexington, KY, Peter M. Kellett, Thomas J. Manganello, Michael A. Tesner, Feeney, Kellett, Wienner & Bush, Bloomfield Hills, MI, for General Motors Corporation.

Bridget L. Dunaway, Taylor, Keller & Dunaway, London, KY, for State Farm Mutual Automobile Insurance Company, Inc.

## MEMORANDUM OPINION AND ORDER

COFFMAN, District Judge.

This matter is before the court upon the defendant's motion for judgment as a matter of law or for a new trial (No. 241), the plaintiff's motion for a new trial on damages (No. 243), and the counterclaimant's motion to amend this court's October 26, 2000 order and judgment (No. 245). For the reasons stated below, the defendant's motion will be granted and the plaintiff's and the counterclaimant's motions will be denied as moot.

The plaintiff's complaint alleges that he sustained injuries in an August 12, 1995 vehicle accident due to the defendant's defectively designed seat belt restraint system. Todd Gray, a passenger in a 1995 Chevrolet S–10 pickup truck, was partially ejected from the vehicle after it left the roadway and rolled over. At the bifurcated trial, the plaintiff presented a theory of defective design through expert witness Billy Peterson. The jury concluded that Todd Gray was wearing his seat belt and that the truck's restraint system was de-

fectively designed. After the damages phase of the trial, the jury awarded Gray $30,288.20, a sum which included $10,000 for mental and physical suffering and $20,288.20 for hospital, medical, and rehabilitation expenses. The jury did not award Gray lost wages, damages for permanent impairment of the power to earn money in the future, or future hospital, medical, and rehabilitation expenses.

A motion for a judgment after trial under Fed.R.Civ.P. 50(b) may be granted only if "there is a complete absence of proof on a material issue in the action or if no disputed issue of fact exists upon which reasonable minds could differ." *Morales v. American Honda Motor Co., Inc.*, 151 F.3d 500, 506 (6th Cir.1998). "Every favorable inference which may reasonably be drawn from the evidence should be accorded the party against whom the motion is made." *Id.* Here, General Motors bases its motion for a judgment as a matter of law upon the following grounds: (1) Peterson's testimony should have been excluded under Fed.R.Evid. 702, Fed.R.Evid. 104, and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); (2) Peterson's testimony was insufficient to justify submission of the case to the jury; (3) Peterson offered no proof of a safer, alternative, feasible design; and (4) the jury deliberated under confusing and improper instructions.

■ As explained in this court's prior orders, Peterson's testimony was admissible under the standards set forth by the Federal Rules of Evidence and *Daubert*. The plaintiff's contention of confusing and improper instructions must be rejected because the court corrected and cured the error in the interrogatories originally tendered to the jury. However, the plaintiff's proof did not justify submission of the case to the jury.

The only evidence of a design defect in the restraint system was offered by Peterson, who stated that skip lock occurred within the system during the plaintiff's accident. This conclusion was based only on the fact that Gray was wearing the seatbelt and that he was partially ejected: [1]

Q: Okay, so ... what you are saying is, based upon your view of some teeth and the witness of Mr. Gray who says he had his seat belt on, ... the retractor didn't lock up, because (1) he was wearing it; and (2) he was partially ejected.

A: Absolutely.

Moreover, Peterson could not identify any defect which may have caused the alleged skip lock:

Q: ... And [your opinions] first dealt with the teeth. Correct?

A: And the lock bar.

Q: Okay. We'll get to that. Teeth plus lock bar. And that's the retractor teeth, correct?

A: Correct.

Q: Are they too sharp? And if so, how sharp? If they are not sharp enough, how sharp should they be?

A: Sir, without running a series of sled tests, there are about four possible problems with this retractor.

Q: Sir, do you know the answer to how sharp they should be? Yes or no.

A: No, sir.

Q: As you sit here—

A: Not without running tests.

Q: Okay.

A: Because they may not be the teeth that's the problem.

. . .

Q: Okay. Teeth and the look bar. What was the second issue?

A: Sir?

Q: The pendulum? Is there a problem with the pendulum?

A: There may be.

. . . .

**1.** The defendant states that the jury's liability verdict conflicted with evidence that Gray was not wearing a seatbelt at the time of the accident. However, the jury apparently concluded, in the fact of conflicting evidence, that he was wearing the seatbelt.

Q: ... Okay. What's the problem with the pendulum?

A: It could be in the stem, as I told you in the deposition. It could be in the weight of the pendulum.

Q: Uh huh (affirmative response).

A: Or it may be any combination of any of these things.

Q: Did you—did you think that the pendulum was too big, too big a mass?

A: It may be, but I can't say without running a test, sir.

Q: And then the other issue was the stem.

A: Yes.

Q: All right. I'll go the next page for that. Oh, I forgot. What was—what was the opinion about the look bar? What about the lock bar? What was defective about the lock bar?

A: I was talking about in connection with the teeth. And of course the lock bar moving into could have to do with the pendulum, the stem and a number of other things.

Q: Did you identify the lock bar as a defect when I took your deposition?

A: I don't recall that we specifically called it a defect or not.

Q: Did you even mention the lock bar as—as being out of size, out of shape, not hard enough, too hard? Did you make any statement about the lock bar?

A: I don't think that the lock bar itself is the problem.

Q: Okay. That's all I wanted to hear. What else did we talk about? The pendulum, the stem. What about the stem? Too flexible or not flexible enough?

A: It could be either.

Q: Okay. And then the tooth spacing.

A: Sir?

Q: The tooth spacing? Is that something else you mentioned?

A: That could be a part of the problem.

Q: And that's the—those are the jagged teeth that go around the outside of the spool?

A: How many teeth are on the sprocket?

Q: Well, how many teeth are on the sprocket?

A: Eighteen.

Q: Is that a defect?

A: Sir?

Q: Is that a defect? Is 18 teeth on the sprocket a defect?

A: I couldn't say, sir, without running a test.

Q: So tooth spacing may be a problem, but you don't know if it is or not.

A: That is correct.

Although he stated that problems "may" exist with the retractor's teeth, the lock bar and the pendulum, Peterson could not identify which part of the restraint system allegedly caused skip lock. More importantly, he could not identify a defect in any of the parts in the restraint system. Peterson testified that the retractor may not include a sufficient number of teeth, or that those teeth may not be sufficiently sharp, but he also stated that the teeth may not have caused skip lock. Peterson identified the pendulum as a possible cause of skip lock but did not know whether the pendulum had too much mass. He also stated that a problem may exist with the pendulum's stem, but he did not know whether the stem was too flexible or too inflexible. He could reach no definitive conclusions, in short, without testing, which he did not perform.

■ In products liability cases, the plaintiff must demonstrate that an identifiable defect probably caused the accident. *Midwestern V.W. Corp. v. Ringley*, 503 S.W.2d 745 (Ky.1973). In *Ringley*, a plaintiff injured in an automobile accident alleged that when she applied brakes on a wet road, the vehicle pulled to the right and then spun out of control. The plaintiff's expert witnesses testified that the vehicle's right front brake drum was "out of round." The experts stated that this manufacturing defect would cause the ve-

hicle to pull to the right. *Id.* at 747. The plaintiff failed to show, however, that this alleged defect was the "probable cause of the accident." *Id.* The plaintiff's experts identified dirt or water in the brake lining, improper tire pressure, improper adjustment of the brake, and improper alignment as other possible causes of pulling. The court reversed a jury award in favor of the plaintiff:

> None of [the plaintiff's] expert witnesses testified that the "out of round" brake drum "probably" caused the automobile to pull to one side at the time of the accident. The testimony was that an "out of round" brake drum was dangerous and would cause the automobile to pull when the brakes were applied, also that other conditions asked about would cause the automobile to pull when the brakes were applied.... Although the jury may draw reasonable inferences from the evidence of a defect in manufacturing, it is incumbent on the plaintiff to introduce evidence that will support a reasonable inference that the defect was the "probable" cause of the accident as distinguished from a "possible" cause among other possibilities; otherwise, the jury verdict is based upon speculation or surmise.

*Id.*

Similarly, in *Briner v. General Motors Corp.*, 461 S.W.2d 99 (Ky.1970), the court affirmed a directed verdict in favor of the defendant manufacturer. The plaintiff alleged that her automobile had vibrated prior to a collision. The plaintiff's expert witnesses stated that this vibration resulted in freezing of the steering mechanism, a loose wheel bearing, or a breakdown in the linkage of the steering system. *Id.* at 101. Although the plaintiff's experts identified the vibration as the cause of the accident, they could not identify any defect which probably caused the vibration. The experts stated that the vibration could have been caused by "incorrect tire balancing, an improperly mounted air conditioner compressor, misalignment, or a loose or

broken bearing...." *Id.* The court stated that testimony of numerous possible defects was "insufficient to establish a reasonable probability that there was a ... defect in the plaintiff's automobile ... which caused the accident. Such a possibility exist, but the law requires more than that." *Id.*

██ The plaintiff offered circumstantial evidence to show that a defect caused skip lock, which caused Gray's enhanced injuries. *Beverly Hills Fire Litig.*, 695 F.2d 207, 219 (6th Cir.1982). However,

> [w]hile reasonable inferences are permissible, a jury verdict must be based on something other than speculation, supposition, or surmise. The type of evidence that will support a reasonable inference must indicate the probable as distinguished from a possible cause. There must be sufficient proof to tilt the balance from possibility to probability.... Thus, defendants invariably receive a judgment in their favor as a matter of law in Kentucky where plaintiffs are unable to isolate one cause, either by direct evidence, or, more relevant to the present case, by eliminating other possible causes.

*Id.* Like the experts in *Ringley* and *Briner,* Peterson identified a phenomenon—skip lock—as the cause of the plaintiff's injuries. He outlined numerous possible problems with the restraint system which may have caused skip lock. However, he refused to isolate any of those potential defects as a probable cause of skip lock. The plaintiff's proof was simply insufficient to tilt the balance from possibility to probability. *Id.*

██ Even if Peterson's testimony had identified a defect as the probable cause of skip lock, the plaintiff failed to present any proof supporting two crucial elements of his prima facie case. As acknowledged in his response to the defendant's motion, Gray argues not that a defect caused the accident but that a defect caused enhanced injuries. Such an argument constitutes a

crashworthiness claim. *O'Bryan v. Volkswagen of America,* 39 F.3d 1182, 1994 WL 599450 (6th Cir.1994) (unpublished).[2] "In crashworthiness caves, courts deny recovery unless the plaintiff establishes, by competent expert testimony, that the defect was responsible to some degree for enhancement of injury to the plaintiff. The plaintiff's proof in such cases must include competent evidence of some practicable, feasible, safer, alternative design." *Id.* at *4. Thus, Gray was required to submit to the jury evidence that he would have suffered a lesser injury had skip lock not occurred and that a practicable, feasible, safer, alternative design existed which would have prevented skip lock. Gray presented no proof of either element.

The plaintiff presented no testimony suggesting that Gray's injuries would have been less severe had the seat belt held him within the vehicle during the collision. Moreover, no evidence was presented regarding an alternative design for the restraint system. In fact, the court expressly precluded such testimony because Peterson had not previously identified any safer alternative designs despite interrogatories requesting such information.[3]

The plaintiff claims that because the restraint system did not operate as he reasonably expected, he need not submit proof of an alternative design or of the level of injuries he would have incurred had he been restrained. Relying on *Worldwide Equip., Inc. v. Mullins,* 11 S.W.3d 50, 55 (Ky.App.1999), Gray claims that he need only prove that the restraint system did "not meet the reasonable expectations of the ordinary consumer as to its safety." In Kentucky, the consumer expectations test does not apply to design defect cases. *Hill v. R.J. Reynolds Tobacco Co.,* 44 F.Supp.2d 837, 842 (W.D.Ky. 1999); *Nichols v. Union Underwear Co., Inc.,* 602 S.W.2d 429, 432 (Ky.1980). Even if the test were applicable, the reasonable-

2. The plaintiff contends that *O'Bryan* is inapplicable because it is an unpublished decision. However, citation to an unpublished authority is "allowed where the facts of an unpublished case are similar to those of the case at bar and the reasoning of the unpublished opinion is sound." *Frilling v. Honda of America Mfg., Inc.,* 101 F.Supp.2d 841, 847 (S.D.Ohio 1998). The court also notes that the *O'Bryan* court's holding relied heavily upon previously published Kentucky cases.

3. THE COURT: All right. All right. Now, what's your objection then to his testifying about it?
MR. MANGANELLO: Because now he's going to start proffering testimony about features that he has never discussed before, pretensioners, web grabbers, substantive designs. I have asked six times what features he was talking about in the alternative designed.
THE COURT: And this is—
MR. MANGANELLO: And he never identified it.
THE COURT: This is what you have just given me?
MR. MANGANELLO: Yes ma'am. And if you look—if you look at the interrogatory number 33.
THE COURT: All right. I have that right here.
. . . .

MR. MANGANELLO: Set forth with particularity the alternative designs of the parts that, da-da-da-da. This will be furnished shortly. Never got a supplement.
THE COURT: Okay.
. . . .

THE COURT: All right. Ms. Robinson, any response to that? I will say generally your expert is limited to what he has already said. The supplementation deadline has come and gone and he's limited to what he's already said.
. . . .

THE COURT: Well, have you any indication—The objection is, he's way outside the scope of his opinion under Rule 26. And have you any indication that Mr. Peterson before today has ever talked about the alternative designs in Europe?
MS. ROBINSON: The only thing I can say, Your Honor, is in this affidavit that was furnished to them on January 18th of 1999, he stated: GM offered belt systems on their vehicles produced in Europe and Australia before this vehicle was manufactured that would have properly restrained Mr. Gray.
THE COURT: Then that's—is that all he says there?
MS. ROBINSON: That's all he says. He does not describe the alternative design.
THE COURT: Then that's all he can do here.

ness of a defect presupposes the identification of a defect. ·Here, the plaintiff failed to identify any aspect of the restraint system as a probable cause of skip lock. The consumer expectations test does not relieve the plaintiff of the obligation to identify a "provable defect" as the probable cause of his injuries. *Ulrich v. Kasco Abrasives Co.,* 532 S.W.2d 197, 199 (Ky. 1976).

Because there exists a complete absence of proof on several material issues, the defendant's motion for judgment as a matter of law must be granted under Fed. R.Civ.P. 50(b). A new trial of this case is inappropriate because no evidence suggests "that the defect in the proof might be remedied on a second trial." *Network Publications, Inc. v. Ellis Graphics Corp.,* 959 F.2d 212, 214 (11th Cir.1992). Furthermore, the evidence lacking in this case was not excluded by any error of the court. *Id.*

### ORDER

For the reasons stated above, **IT IS ORDERED** that the defendant's motion for judgment as a matter of law is **GRANTED.**

**IT IS FURTHER ORDERED** that the plaintiff's motion for a new trial on damages is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that the counterclaimant's motion to amend this court's judgment and order is **DENIED AS MOOT.**