# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: MARCH 18, 2010
NOT TO BE PUBLISHED

**Supreme Court of Kentucky** FINAL

DATE 4/8/10 *Kelly Klaber* D.C.

2008-SC-000786-MR

TIMOTHY SMITH                                                             APPELLANT

V.
ON APPEAL FROM KENTON CIRCUIT COURT
HONORABLE PATRICIA M. SUMME, JUDGE
NO. 07-CR-00776

COMMONWEALTH OF KENTUCKY                                    APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING IN PART AND VACATING IN PART

In June of 2007, Appellant, Timothy Smith, stayed for several nights at

the residence of his brother, Shawn Abernathy, in Covington, Kentucky.

Abernathy lived with Gloria Young and her three children. On the first night

that Appellant stayed with the family, he entered the bedroom of Young's

daughter, K.Y., who was eleven years old. K.Y. was asleep on her bed and

Appellant laid down beside her. When she awoke, K.Y. noticed that Appellant

had pulled down her pants and she could feel his "private in her behind." She

could feel Appellant moving back and forth and then felt something wet on the

back of her legs. Appellant instructed her not to tell anyone what had

happened and gave her a dollar. Appellant left and K.Y. washed herself with a

rag. She did not tell anyone what had occurred because she believed it would not happen again.

K.Y.'s next encounter with Appellant occurred the following night. Appellant went to K.Y.'s room late in the evening, pulled down her pants and underwear, and "put his private in her private." When Appellant was finished, he again instructed her not to tell anyone what had happened and gave her another dollar. Appellant then came to her room a third time while she was on the floor watching television with her brother, who had fallen asleep. Appellant laid next to K.Y., and she unsuccessfully attempted to wake her brother. Appellant then pulled down K.Y.'s pants and put his "private in her behind." When Appellant finished, he again offered her a dollar and told her not to tell anyone what had happened.

K.Y.'s mother noticed that her behavior had changed during this time. She asked her daughter if something was wrong, and K.Y. eventually told her what had happened. Gloria Young immediately took K.Y. to Cincinnati Children's Hospital, and she was examined by Dr. Matthew Mittiga in the emergency room. Dr. Mittiga performed a screening test for chlamydia and gonorrhea, as well as a urine test for pregnancy. Before receiving the lab results for the chlamydia and gonorrhea tests, Dr. Mittiga prescribed antibiotics as a prophylactic measure to treat any possible sexually transmitted disease. Within twenty four hours, the lab results showed that K.Y. tested positive for chlamydia. According to Dr. Mittiga, a second test to confirm the

2

results was not performed because such a test involved inserting a swab into K.Y.'s vagina; and since she did not give a history of having had consensual sexual intercourse in the past, he decided against the invasive procedure. Additionally, Dr. Mittiga performed a physical examination of K.Y. and discovered no abnormalities.

K.Y. was examined a second time by Dr. Kathy Mackeroff, a physician with the Mayerson Center for Safe and Healthy Children in the Cincinnati Children's Hospital. Dr. Mackeroff, a specialist in child abuse pediatrics, performed a genital and anal exam of K.Y., both of which were normal. Dr. Mackeroff then became concerned about sexual abuse after reviewing K.Y.'s emergency room records and her history.

The comforter on K.Y.'s bed was collected by Detective James Coots and sent to the lab for examination. The DNA analysis of the two cuttings from the comforter matched Appellant's DNA profile.

At trial, Appellant was convicted of one count of first-degree rape and one count of first-degree sexual abuse. Appellant was sentenced to 45 years imprisonment, with conditional discharge, monetary restitution, and multiple other penalties. Appellant now appeals the final judgment entered as a matter of right, Ky. Const. § 110(2)(b).

Appellant raises several issues on appeal: (1) the trial court erred in admitting test results showing K.Y. had contracted chlamydia; (2) the trial court erred in excluding evidence that K.Y. could have contracted chlamydia

3

from another sex partner; (3) the trial court erred in admitting the testimony of Dr. Mackeroff regarding her opinion that an undamaged, intact hymen is "normal" after sexual penetration; (4) the trial court sentenced Appellant to numerous unauthorized penalties; and (5) a clerical error in the final judgment erroneously reflects that the victim suffered a serious physical injury.

Each shall be addressed in turn.

### *NAAT showing positive result for chlamydia*

For his first assignment of error, Appellant claims that the trial court erred in allowing testimony concerning the test used by Dr. Mittiga to determine whether or not K.Y. tested positive for chlamydia. Dr. Mittiga performed a nucleic acid amplification test (NAAT) using a urine sample from K.Y. Essentially, the NAAT looks for the DNA of the microbe chlamydia and amplifies it if it is present, and, if present, the test shows a positive result. According to Appellant, the test did not meet the *Daubert* factors for reliability, and the trial court erred in its admission to Appellant's "extreme prejudice."

Kentucky Rule of Evidence (KRE) 702 allows a qualified expert to testify in the form of an opinion or otherwise with respect to scientific, technical, or other specialized knowledge, provided that the testimony is scientifically reliable and will assist the trier of fact to understand the evidence or to determine a fact in issue. The trial judge must make a preliminary determination that the testimony will satisfy these reliability and relevancy requirements. Further, while trial courts are considered "gatekeepers" under

*Daubert,* they are to be given "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999). As such, a finding that the testimony is scientifically reliable is reviewed for clear error. *Ragland v. Commonwealth,* 191 S.W.3d 569, 580 (Ky. 2006). *See also Miller v. Eldridge,* 146 S.W.3d 909, 915 (Ky. 2004).

The United States Supreme Court has outlined a four-factor test to determine the reliability of expert scientific testimony: whether a "theory or technique . . . can be (and has been) tested"; whether it "has been subjected to peer review and publication"; whether, in respect to a particular technique, there is a high "known or potential rate of error," and whether there are "standards controlling the technique's operation"; and whether the theory or technique enjoys "general acceptance" . . . within a "relevant scientific community." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592-94 (1993). The test of reliability outlined in *Daubert* is a flexible one, and although it identifies a list of factors to consider, those "factors neither necessarily nor exclusively appl[y] to all experts or in every case." *Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 577 (Ky. 2000).

In the instant case, the trial court conducted a *Daubert* hearing to determine the reliability of the test. Though the NAAT used by Dr. Mittiga was technically not approved by the FDA for use in females under the age of twelve, defense counsel conceded that this was a non-issue, stating that lack of FDA

5

approval "doesn't really concern me" because "that's a whole different standard." Furthermore, as Dr. Mackeroff made clear from her telephonic interview during the hearing, its non-approval was not due to its ineffectiveness. Instead, the lab company did not perform the test on females under twelve years of age because of legal concerns. Specifically, the lab company feared that it would be legally obligated to report instances of sexual abuse in pre-pubertal girls. For that reason, the lab company chose not to perform the NAAT on females under twelve years of age and, therefore, the FDA had no data available to either approve or disapprove the test.

More importantly, Dr. Mackeroff noted that the Cincinnati Children's Hospital performed the NAAT on females of all ages "all the time." Though she said that the usual protocol was to conduct a follow-up genital swab exam to confirm a positive result, this was typically done on pre-pubertal children. However, according to Dr. Mackeroff, K.Y. was physically and sexually developed and well through her pubertal period. In conjunction with this testimony, Dr. Mackeroff testified that she performed the Tanner scale test on K.Y. during her first consult. The Tanner scale rates individuals on how far they have progressed through puberty, with "five" indicating the highest level of maturity. Dr. Mackeroff indicated that K.Y. received a score of five.

Unlike the usual protocol for pre-pubertal children, there was no set policy and "no one right answer" for pubertal females. Since the NAAT was designed for pubertal females, she believed that reliability of the result was not

a concern. She also quelled Appellant's concerns over the fact that more than the recommended amount of urine was provided for the sample. According to her testimony, having a higher amount of urine than called for in a sample runs a risk of returning a false negative due to the sample being over-diluted. Since the test was positive for chlamydia, the larger sample did not affect the result.

Additionally, Dr. Mackeroff testified that while she would have done a follow-up exam, she noted the realities facing emergency room physicians who typically diagnose and immediately treat patients. She concluded that "most" emergency rooms would perform the NAAT and give the patients antibiotics as a prophylactic measure, as Dr. Mittiga did. In fact, Dr. Mackeroff indicated that the NAAT can, and sometimes is, used as the definitive test in the emergency room. Since Dr. Mackeroff worked in the sexual abuse clinic, however, she testified that a second round of tests would typically be done due to the likelihood of legal action.

Considering the unrefuted testimony offered by Dr. Mackeroff during the *Daubert* hearing, we cannot say that the trial court's decision was clearly erroneous, as there was sufficient evidence to determine that the NAAT was reliable in this situation. Dr. Mackeroff's testimony indicated that there was never a concern over the reliability of the NAAT itself, but that there was little data available on its usage for females under the age of twelve, due typically to a lack of sexual activity in children that young. We find no error.

### *Evidence that K.Y. was sexually active and could have contracted chlamydia from another partner*

Appellant sought to introduce KRE 404(b) evidence of an alleged text message K.Y. sent to Denay Abernathy and Sherry Smith, indicating that she was sexually active with one or two teenage boys. Appellant wished to introduce this text message to show that K.Y. could have contracted chlamydia from someone other than himself. Appellant contends that the trial court's ruling denied him the right to present a defense. Though Appellant couches his argument in terms of KRE 412 and KRE 404(b) in his brief to this Court, the trial court did not reach those issues. Instead, the court determined that the evidence was hearsay and, thus, inadmissible. We, therefore, review the decision to exclude the evidence under an abuse of discretion standard. *Mullins v. Commonwealth,* 956 S.W.2d 210, 213 (Ky. 1997).

Even assuming for the sake of argument that the evidence was admissible under KRE 412 and KRE 404(b), the trial court did not abuse its discretion by not allowing its introduction. KRE 412(b)(1) still requires that the offered evidence be "otherwise admissible under these rules." Appellant sought to establish K.Y.'s sexual activity with other boys in the area as a possible source for her contraction of chlamydia. However, Appellant planned to introduce this evidence through the testimony of Denay Abernathy and Sherry Smith, the two individuals who allegedly received the text message from K.Y. Because no testimony would be given from either a person who had sexual

8

intercourse with K.Y. or someone who had observed another person having sexual intercourse with K.Y., this testimony would constitute inadmissible hearsay. Therefore, the trial court did not abuse its discretion in not allowing the evidence.

### Testimony of Dr. Mackeroff that intact hymen is "normal"

Appellant next maintains that the trial court erred in allowing Dr. Mackeroff to testify that having an intact hymen is "normal" after sexual penetration. Additionally, Appellant claims that he was prejudiced in not having advance copies of the literature Dr. Mackeroff relied upon to come to that conclusion. Finally, Appellant contends that Dr. Mackeroff improperly bolstered K.Y.'s statements regarding sexual abuse and invaded the province of the jury by relying on her "history" to determine whether sexual abuse occurred.

The trial court conducted a *Daubert* hearing due to defense counsel's objection concerning the basis for, and reliability of, Dr. Mackeroff's proposed testimony. During the hearing, Dr. Mackeroff cited her eleven-year experience as a resident of the Children's Hospital of Pittsburgh, and as a practicing physician at the Mayerson Center for Safe and Healthy Children in the Cincinnati Children's Hospital. Additionally, Dr. Mackeroff noted multiple studies which indicated that the vast majority of females who report sexual abuse or consensual sexual activity show no physical injury to the hymen. Primarily, the lack of hymeneal injury is due to the resilient nature of the body.

9

The hymen becomes thicker and more redundant as females experience puberty and develop sexually, and the hymen itself heals relatively quickly. In regards to K.Y.'s lack of injury, Dr. Mackeroff noted that she was well developed sexually, thus making her hymen more resilient and less susceptible to injury.

The trial court committed no error in allowing Dr. Mackeroff to testify. In *Collins v. Commonwealth*, 951 S.W.2d 569 (Ky. 1997), this Court allowed an expert to testify to this exact issue. Like *Collins*, Dr. Mackeroff's opinion "was based upon her experience with pelvic examinations, as well as extensive medical research she had studied." *Id.* at 574. Here, unlike *Collins*, a *Daubert* hearing was conducted. *Id.* at 575 ("Dr. Bates's testimony . . . concerned basic female anatomical findings. Her examinations did not involve any novel scientific techniques or theories. . . . We discern nothing of a scientific nature to trigger the necessity of applying the *Daubert* analysis."). Dr. Mackeroff was clearly qualified under KRE 702 as an expert due to her knowledge, experience and training in this area. Also, her testimony clearly assisted the trier of fact to understand a fact in issue: the presence of a hymen in a female who has been allegedly sexually abused.

Additionally, Appellant's argument that he was entitled to the reports relied upon by Dr. Mackeroff is without merit. As this Court made clear in *Collins*:

> [T]here is no requirement that an expert tender each and every article or study upon which an opinion is

10

> based. In fact, Kentucky Rule of Evidence 705 states, in part, that "an expert may testify in terms of opinion or inference and give reasons thereof without prior disclosure of the underlying facts or data, unless the court requires otherwise." The Commonwealth was not required under either the discovery order or the criminal rules to provide Appellant with all of Dr. Bates's reading material.

*Id.* at 574.

As in *Collins*, the studies relied on by Dr. Mackeroff were not made in connection with this case. *Id.* As KRE 705 does not require that a testifying expert tender the reports relied upon, Appellant's claim must fail.

Moreover, we do not believe that Dr. Mackeroff bolstered K.Y.'s allegations or in any way improperly relied on her "history." While it is certainly true that a witness cannot vouch for the truthfulness of another witness, there is no indication that this happened. *Stringer v. Commonwealth*, 956 S.W.2d 883, 888 (Ky. 1997). At no point during her testimony did Dr. Mackeroff express any opinion as to the veracity of the claims made by K.Y. To the contrary, Dr. Mackeroff's testimony was concerned mostly with her examination of K.Y. and the evaluation of her medical history. *See Turner v. Commonwealth*, 914 S.W.2d 343, 346 (Ky. 1996). She became concerned about possible sexual abuse in light of K.Y.'s allegations and the positive result of the NAAT. Furthermore, according to the opinion of Dr. Mackeroff, K.Y.'s allegations were not inconsistent with a lack of hymeneal injury. "Answers such as 'it can be' and 'it's not inconsistent' surely cannot be taken as blanket

11

endorsements of the truthfulness of the child/victim's allegations." *Id.* Further, there is not a single statement made by Dr. Mackeroff that indicates a belief in Appellant's guilt. Much like the testimony offered in *Turner*:

> [T]his testimony . . . involved an examination of the child/victim which proved to be negative, revealing no physical manifestations of sexual abuse – a fact Appellant was able to convey on cross-examination. It is difficult, indeed, to perceive reversible error where evidence could be used in Appellant's favor as surely as it could be used against Appellant.

*Id.* at 347.

Had Dr. Mackeroff testified that she believed Appellant was guilty, her testimony clearly would have invaded the province of the jury by rendering an opinion as to the ultimate issue. "However, an opinion that a result is consistent with a factual scenario is not an opinion that the scenario occurred." *Stringer*, 956 S.W.2d at 889. As such, we see no error.

### Imposition of unauthorized sentence

In addition to the 45-year sentence imposed against Appellant, the trial court included a litany of other penalties which, according to Appellant, it had no authorization to impose. Though Appellant concedes that this issue was not preserved, this Court has made clear that sentencing issues may be raised for the first time on appeal. *Cummings v. Commonwealth*, 226 S.W.3d 62, 66 (Ky. 2007). Since this claim of error was not preserved, it must be reviewed under the palpable error standard. RCr 10.26. The basic palpable error

review, where an unpreserved error requires reversal, is "if a manifest injustice has resulted from the error," which means there "is [a] probability of a different result or [the] error [is] so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006).

In its October 3, 2008 order,[1] the trial court imposed the following additional penalties upon Appellant:

The Defendant shall:

Submit to a polygraph testing at Defendant's expense.

Submit to DNA testing.

Submit to HIV testing.

No contact with minors without permission of the probation and parole officer and treatment provider.

Cannot reside near a school, day care center, park, or playground, or other locations where children are known to congregate.

Cannot possess sexually arousing materials, including magazines, videotapes, or any other material downloaded from the Internet.

Cannot use any photographic including still and video cameras.

Cannot use of computer equipment including Internet access.

Cannot establish romantic relationships without the permission of the probation and parole officer and treatment provider.

Cannot have employment that maybe (sic) used to attract or acquire new victims, or that places him in contact with or control over adolescent females.

Stay away from victim at least 1000 yards and of a high school, middle school, elementary school, preschool or licensed day care center, near a park, playground, or other places where children and juveniles tend to congregate.

---

[1] The penalties listed are taken verbatim from the trial court's order.

No contact with victim with any member of their immediate family nor with the (sic) any persons with whom the victim is living without the express prior approval of his therapist and community supervision agent.

No contact with victim without the express prior approval of his therapist and community supervision agent.

Assume financial responsibility for any treatment required by himself and any treatment required by the victim of his offense and keep those accounts current.

According to Appellant, the court had authority under KRS 532.043 to impose a sentence of conditional discharge, but could not set the future terms of that conditional discharge, except for restitution pursuant to KRS 532.033 and the requirement that he register as a sex offender under KRS 17.510(4). Additionally, even though the court had authority to impose restitution, the court failed to follow the requirements of KRS 532.033. Finally, Appellant argues that the remaining penalties imposed by the trial court were *ultra vires* and illegal, because they were not authorized by statute.

We agree with Appellant that the trial court lacked authority to dictate future conditions of his conditional discharge. While the trial court was required by KRS 532.043 to sentence Appellant to conditional discharge, subsection (3)(a) makes clear that it is the Department of Corrections, not the court, that sets future conditions.[2] This is further emphasized in subsection (3)(b), which indicates that the Defendant must "[c]omply with all education, treatment, testing, or combination thereof required by the Department of

---

[2] This Court takes notice of the interplay and potential conflict between KRS 532.043 and KRS 533.030, but that issue is not before us and we decline to address it in this matter.

14

Corrections." The trial court acted without authority in setting the conditions to be imposed upon conditional discharge. That portion of the final sentence is therefore void. *Manning v. Commonwealth*, 281 Ky. 453, 136 S.W.2d 28, 30 (1939) (quoting 15 Am. Jur. Criminal Law § 460 ("[T]he imposition of a sentence in excess of what the law permits does not render the legal and authorized portion of the sentence void, but only leaves such portion of the sentence as may be in excess open to question and attack, provided the valid and invalid parts are separable.")).

In addition, the final sentence imposing restitution must be vacated. While KRS 533.030(3) permits the trial court to order Appellant to pay for damages caused, the trial court failed to follow the procedures outlined in KRS 532.033. Subsections (3) and (4) of that statute require the trial court to set a certain, specified amount to be paid to the victim. However, in the final order, the trial court required Appellant to assume financial responsibility for "any treatment required by the victim of his offense." No provisions were made for the amount of money to paid, the frequency of payments, or any way to monitor payments to ensure that Appellant complied with the order. We, therefore, vacate that portion of the sentence. *Manning*, 281 Ky. 453, 136 S.W.2d at 30.

### Clerical error

As his final assignment of error, Appellant points to language in the trial court's final judgment and sentence. The problematic language states that "the

15

victim suffered a serious physical injury." As both Drs. Mittiga and Mackeroff testified, K.Y. suffered no physical injury and Appellant was not convicted of causing such. The Commonwealth concedes this error. We, thus, order the trial court to correct its clerical error in the sentencing order by removing reference to any serious physical injury. RCr 10.10.

The final judgment and sentence of the Kenton Circuit Court is hereby affirmed, except for the portion thereof imposing future conditions of conditional discharge and restitution, which is vacated.

Cunningham and Venters, JJ., concur. Minton, C.J.; and Abramson, J., concur in result only. Noble, J. dissents by separate opinion, in which Schroder, J. joins. Scott, J., concurs in part and dissents in part by separate opinion.

NOBLE, J., DISSENTING: Respectfully, I dissent as to the propriety of the "expert" testimony of Dr. Mackeroff. First, her testimony regarding intact hymens after penetration does not pass analysis under *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and secondly, by its very content, does nothing more than bolster the victim's testimony.

The landmark case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), requires a trial court to analyze several factors in order to make a preliminary finding that the proffered evidence is "valid" or "reliable." *Kumho Tire* broadens the *Daubert* analysis to include "other specialized knowledge," such as the opinion testimony offered here, and requires a case-

16

by-case analysis. This Court, first in *Mitchell v. Commonwealth*, 908 S.W.2d 100 (Ky. 1995), then in *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35 (Ky. 2004), adopted the analysis of these two cases, an approach which was codified in the 2007 amendments to KRE 702. The facts or data relied upon by the expert witness must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," and must be "trustworthy, necessary to illuminate testimony, and unprivileged." KRE 703(a), (b).

In the federal courts, this assessment is often aided by referencing the *Reference Manual for Scientific Evidence* (2d ed. 2000), published by the Federal Judicial Center in Washington, D.C. This manual discusses the leading decisions on the admissibility of expert testimony in general, explains scientific analyses, and gives examples of detailed *Daubert* treatments for evidence such as statistics and survey research in addition to epidemiology, toxicology, and DNA evidence. All federal judges are provided a copy of the manual, which has several sections dealing with various types of expert testimony. The unifying thread of discussion in all the areas, however, is focused on why the expert testimony is needed and whether it is based on reliable observations or data. Specifically, "[e]xpert evidence should not be permitted on issues that are not disputed or not disputable. Nor should it be permitted on issues that will not be assisted by such evidence. This would be true, for example, of expert testimony offered essentially to embellish the testimony of fact witnesses . . . ."

William W Schwarzer & Joe S. Cecil, *Management of Expert Evidence, in Reference Manual for Scientific Evidence, supra,* at 39, 47–48.

Thus the role of expert testimony in any case is to advise the jury on technical, complicated, or scientific subjects that the jury needs assistance to understand, not to testify about what a jury is able to understand on its own. Questions of whether a witness is truthful are the sole province of the jury; questions requiring specialized knowledge, such as medical diagnoses, are most likely to be more easily answered with the aid of an expert explanation. Still, only after technical or scientific information has first been found to be reliable by the trial court in its *Daubert* gatekeeper role can it be used as the basis of forming expert opinions or inferences upon the subject. KRE 703(a). Consequently, before expert testimony as to technical or scientific information is allowed, the trial court must first answer two questions: does the trier of fact (the jury) need the assistance of the expert to understand the subject, and is the information reliable under *Daubert* and *Kumho Tire*?

To answer these questions here, it is necessary to first examine the content of the expert testimony. Dr. Mackeroff testified that based on her experience over eleven years working in the clinic at Cincinnati Children's Hospital, and two studies she referenced, about girls who *reported* sexual abuse in one study and those who had given birth in another, it was "normal" for the hymen to be intact upon examination after a claim of penetration, which was the case with the alleged victim here. For one of the studies, she

knew the journal it was published in, the title of the article (*It's Normal to Be Normal*), and the author, but did not know any details about how the data was collected, the basis for claiming sexual abuse or any statistical results of the study. She could name neither the journal nor the author of the second study, and none of the statistical data, but she did remember it involved a small number of participants, thirty-six girls. Though unverified, this study, a sampling of pregnant girls, likely had greater impact because there was no question of actual sexual contact.

Based on this testimony, the doctor was permitted to opine that an intact hymen was "consistent" with sexual penetration. Further, she testified that it was her opinion that the alleged victim had been penetrated sexually because of the history the girl gave and the fact that she tested positive for chlamydia.

The question the trial court had to answer as a preliminary matter under the authority cited above is whether expert testimony was needed, and then whether the studies were the type of "facts or data" *reasonably relied upon* to form an expert opinion or inference.

As to the first question, whether expert testimony was necessary to understand the evidence at issue, the answer is that it reasonably was. The testimony was not offered to prove that the alleged victim had physical evidence of penetration such as a torn hymen, because it was undisputed that her hymen was intact. It was instead offered to rebut the Appellant's inference that there had been no penetration *because* the hymen was intact. By referring to

her observations and the studies, Dr. Mackeroff established that it is possible to have penetration and still have an intact hymen. While it is not necessary to prove *anything* about the state of the hymen in order to obtain a conviction, as even slight penetration is sufficient to convict, since the Appellant was arguing that an intact hymen meant *no* penetration, some expert testimony clarifying the physiology related to that argument could assist the trier of fact.

The second question, whether the experience and studies she relied upon to support that opinion were reliable, is where her testimony derails. Even though the trial court conducted a *Daubert* hearing, there is nothing in the record to indicate that the court inquired as to the reliability of the underlying data or other common *Daubert* factors. In fact, Dr. Mackeroff did not have the studies with her, did not know the statistics behind the studies, and did not know if a control group was used in the studies, saying only that the studies "do the best they can."

The type of studies she described is known as a case series study, the most basic type of descriptive study. These offer no comparisons to other demographic groups or even other similarly situated groups. Mary Sue Henifin, Howard M. Kipen & Susan R. Poulter, *Reference Guide on Medical Testimony, in Reference Manual for Scientific Evidence, supra,* at 439, 480.

While it is obvious that expert knowledge is acquired from absorbing facts, commentary, and observations over a period of time, our law is now clear that an expert must be able to do more than merely say "studies show"

something in order to rely on them at trial. Expert opinions differ from lay opinions because of the training and knowledge an expert brings to the stand. Even so, since *Daubert,* an expert must be able to establish the facts and data that he or she relies on to a sufficient degree that the trial court can reasonably find that the facts and data are trustworthy. A passing reference to studies cannot be the basis of establishing a material fact if they have not first been determined to be reliable. This is particularly true when the expert opinion runs contrary to widely held "common knowledge." While such common belief can be woefully wrong, expert testimony that rebuts it must be trustworthy.

The doctor was well within her expertise to describe what she herself had observed over eleven years of practice. That experience can be subject to rigorous cross-examination and fleshed out because she is the primary source of her testimony.

However, her reliance on "studies" must be subject to the reliability analysis of scientific evidence required by *Daubert* and its progeny. Here, there are inadequate indicia of reliability.

To begin, the doctor engaged in a discussion of "normal" that was misleading. "Normal" is a term that carries connotations to the lay person that differ dramatically from the scientific. It is an emotionally weighted term often used by advocates, which is what this witness was, to infer that a person is not unusual in a negative way. Scientifically, it means the establishment of a norm, an actual or set standard determined by the *typical* or *most frequent*

21

behavior of a group. BLACK'S LAW DICTIONARY 1086 (8ᵗʰ ed. 2004).

To establish that it is "normal" for a hymen to remain intact after penetration, the studies she referenced would have to establish that such was most frequently the case, or that such is typical. The studies she referenced don't begin to do this. First, she did not testify as to how the number of participants in the studies related to the population as a whole. She did not testify about the conditions under which the studies were conducted nor the scientific parameters of the studies such as a listing of expected outcomes and whether such outcomes occurred. She did not testify as to how the small number in the second study could be legitimately extrapolated to the general population in order to meaningfully apply its results. In fact, she could not even testify as to how many of the study participants actually reflected its premise. This inadequacy was compounded on the second study because she did not know its title, author or the journal in which it was supposed to be published.

Second, even though this issue had apparently been raised prior to trial, the studies were not disclosed to the Appellant prior to trial, and were not available during the *Daubert* hearing. This made meaningful cross examination during the hearing an impossibility.

There is simply no conscionable way for the trial court to determine that the studies were reliable evidence. Yet the jury was allowed to hear about these studies as if they represented reliable scientific evidence, from a

physician cloaked in the role of expert witness.

The doctor's opinion was based on three things: an intact hymen is "normal", the alleged victim gave a history of penetration, and she had chlamydia. Certainly an intact hymen does not prove that penetration *did* occur. Relying on the alleged victim's history is no more than saying it must be true because she said so. And Dr. Mackeroff could only state that she "believed" the only way to get chlamydia was through penetration, but offered no authority.

Dr. Mackeroff's opinion was nothing more than improper bolstering of the alleged victim's statement by putting the patina of a medical expert's belief on her claim, and was even possibly incorrect as to the method of contracting chlamydia. It was clearly prejudicial to allow such "scientific" or "expert" testimony, and doing so does harm to the current state of the law in regard to *Daubert* testimony. Consequently, I would reverse and remand for a new trial requiring *reliable* medical expert testimony only.

Schroder, J., joins this dissenting opinion.

SCOTT, J., CONCURRING IN PART AND DISSENTING IN PART: Although I concur on the other issues, I must respectfully dissent on the issue of restitution for the victim's medical expenses. In so doing, I note that KRS 533.030(3) specifically includes restitution for a victim's medical expenses. It also provides that "[r]estitution shall be ordered in the full amount of the damages," unless the damages exceed one hundred thousand dollars

($100,000). KRS 533.030(3). Here, there is no allegation the amount will exceed one hundred thousand dollars ($100,000) and if the amounts are not paid within a reasonable time of tender, I'm sure the victim – through the Commonwealth's Attorney - would bring it before the Court on an appropriate motion. That restitution may take a little more court work after the initial conditional discharge – is nothing new. Thus, I would affirm the restitution order.

COUNSEL FOR APPELLANT:

Susan Jackson Balliet
Assistant Public Advocate
Department of Public Advocacy
100 Fair Oaks Lane, Suite 302
Frankfort, KY 40601

COUNSEL FOR APPELLEE:

Jack Conway
Attorney General

Courtney J. Hightower
Assistant Attorney General
Criminal Appellate Division
1024 Capital Center Drive
Frankfort, KY 40601-8204